STATE OF MAINE      BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.      LOCATION: Portland
              DOCKET NO. BCD-CIV-2021-00047

|  |  |
|---|---|
| MAINE COMMUNITY HEALTH OPTIONS d/b/a COMMUNITY HEALTH OPTIONS,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL GRANT,<br><br>    Defendant.<br><br>MICHAEL GRANT,<br><br>    Counterclaimant,<br><br>  v.<br><br>MAINE COMMUNITY HEALTH OPTIONS d/b/a COMMUNITY HEALTH OPTIONS,<br><br>    Counterdefendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORDER DENYING<br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT** |

## INTRODUCTION

In this case, an insurer seeks reimbursement of payments made towards an insured's medical bills out of that insured's personal injury recovery from the negligent third party who caused his injuries. Michael Grant ("Grant"), the instant Counterclaimant, now seeks summary judgment on his first counterclaim against Counterdefendant Maine Community Health Options (MCHO), namely, declaratory judgment that MCHO has no right to reimbursement from his tort recovery. Grant argues that the lien provision in his MCHO policy (the "Policy") is unenforceable as a matter of law because he alleges MCHO did not obtain his prior written approval as required under 24-A M.R.S. § 2729-A.

1

Summary judgment is appropriate where the parties' statements of material fact and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400. "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view a party's statements of material fact in the light most favorable to the non-movant and draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. However, a party may not "rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence . . . of a fact." *Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 3, 740 A.2d 560. A party who moves for summary judgment is entitled to judgment only if the party opposed to the motion, in response, fails to submit "enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774.

The Court must now determine whether Grant has established undisputed facts supporting a prima facie case that he did not provide prior written approval of the lien provision in MCHO's Policy.

On or about December 24, 2017 Shannon Grant applied for health insurance for her family through the online electronic marketplace and her application with Maine Community Health Options was approved, becoming effective as of January 1, 2018. (Counterdef.'s Add'l S.M.F. ¶ 5.) Shannon Grant was at all relevant times the policy holder on the MCHO policy (the "Policy") and her husband, Michael Grant ("Grant") was a Covered Individual. (Add'l S.M.F. ¶¶ 6-7.) On January 8, 2018, a "Welcome Package" was mailed to Shannon Grant, advising her and Grant that they needed to establish an online Member Portal profile to access a complete copy of their Policy language or request a paper copy from MCHO's Member Services. (Add'l S.M.F. ¶¶ 8-10.) They did establish their online profile and set up automatic premium payments, deducted monthly from a checking account. (Add'l S.M.F. ¶ 11.)

On June 4, 2018, Grant, a logger, was involved in a collision between two trucks on Lincolnville Avenue in Belfast, Maine. (Counterclaimant's Supp'g S.M.F. ¶¶ 1-2, 9.)[2] Grant suffered multiple injuries, including a broken femur, and was rushed to Waldo County Hospital in Belfast before being transferred to Maine General in Portland to undergo several orthopedic surgeries on the day of the crash. (Supp'g S.M.F. ¶¶ 3-4.) Over the first few months of recovery after the surgeries, Grant accumulated $160,505.60 in medical bills. (Supp'g S.M.F. ¶ 7.) Grant did not work for approximately two years after the accident and now, due to lingering pain, can only work at a reduced capacity. (Supp'g S.M.F. ¶¶ 14-15, 18.) MCHO has to date paid

---

[1] "Documents that are unaccompanied by an authenticating affidavit based on personal knowledge under Maine Rule of Civil Procedure 56(e) should not be considered for purposes of summary judgment." *Emery Lee & Sons, Inc. v. Acadia Ins. Grp., LLC*, 2016 Me. Super. LEXIS 38, *12 (citing *Cach LLC v. Kulas*, 2011 ME 70, ¶ 11, 21 A.3d 1015). The fact section herein is based on evidence authenticated by affidavits based on personal knowledge; evidence submitted by the parties lacking such authentication has been disregarded.

[2] The Court notes that under Rule 34(a)(1) of the Maine Rules of Electronic Court Systems, documents submitted electronically to the Business & Consumer Court must be directly converted to PDF, rather than scanned, such that the resulting document is searchable.

$124,487.81 towards his medical expenses (the "Benefits"), an increase from the $116,510.73 cited in the instant Complaint due to a reworking of the claim from Maine Medical Center. (Supp'g S.M.F. ¶ 8; Add'l S.M.F. ¶ 13.)

The other driver's liability insurer settled with Grant for $11,000 in property damage and $489,000 for his bodily injury claim. (Supp'g S.M.F. ¶ 25; Pl.'s Opp. S.M.F. ¶ 25.) Grant only had $100,000 in underinsured motorist coverage through his own auto insurer. (Supp'g S.M.F. ¶ 27.)

After Grant settled with the negligent driver's insurer, MCHO demanded Grant repay $116,510.73, the value of the Benefits at the time of the instant Complaint, from the total sum Grant had received from the other driver's insurer, less a pro rata share of fees and costs. (Supp'g S.M.F. ¶ 28; Opp. S.M.F. ¶ 28; Add'l S.M.F. ¶ 14.) Grant has refused to reimburse MCHO. (Add'l S.M.F. ¶ 15.) He does not believe he owes MCHO this money. (Supp'g S.M.F. ¶ 38.) Grant's attorney has retained funds in the disputed amount in a Maine State Bar Trust Account pending the outcome of this litigation. (Supp'g S.M.F. ¶ 30.)

The policy provision at issue reads:

> When we provide Benefits for treatment of such injury or illness, we have the right to recover, on a just or equitable basis, from any such payment (whether or not such payment is for medical expenses) up to 100% of the Benefit we paid. We also have subrogation rights against your other insurance coverage provider, including medical payments, uninsured, and underinsured motorist provisions in your auto insurance policy. We reserve the right to recover from a Member up to 100% of the value of Benefits provided or paid for by the Plan when a Member has been, or courld have been, reimbursed for the cost of care by a third party. Northing in this Agreement shall be interpreted to limit Health Options' right to use any remedy provided by law to enforce Health Options' rights to subrogation under this Agreement.

(Supp'g S.M.F. ¶ 32.) This language and relevant premium rates were approved by the Maine Bureau of Insurance on August 14, 2017. (Add'l S.M.F. ¶ 2.)

Grant selected his policy with MCHO because its deductible, copay, co-insurance, and premium was closest to meeting his family's needs. (Supp'g S.M.F. ¶ 51.) The Grants paid all their premiums. (Supp'g S.M.F. ¶ 54.) Grant did not provide separate written approval for MCHO to pursue a collection action against him. (Supp'g S.M.F. ¶ 46.) After Grant took out the Policy, MCHO did not ask him to sign off separately on anything approving the reimbursement provision. (Supp'g S.M.F. ¶ 53.) Grant never "clicked" on a link affirmatively approving MCHO to seek a lien. (Supp'g S.M.F. ¶ 58.)

DISCUSSION

Maine law poses three requirements for health insurance priority liens, i.e., for an insurer to secure reimbursement of payments made to the insured if the insured is entitled to receive those payments from a third party: the policy in question must (i) require prior written approval of the insured, (ii) be approved by the superintendent, and (iii) require a just and equitable basis for the subrogation. 24-A M.R.S. §§ 2729-A & 2910-A. Grant does not dispute the latter two requirements here. He argues only that the Policy he had with MCHO did not require his prior written approval and that he never gave such approval, meaning it is in violation of Maine statutory law and MCHO cannot require him to reimburse the Benefits.

This Court interprets statutes first according to their plain, unambiguous meaning. *Thurston v. Galvin*, 2014 ME 76, ¶ 13, 94 A.3d 16. An insurance policy is a contract, *Ouellette v. Maine Bonding & Cas. Co.*, 495 A.2d 1232, 1234 (Me. 1985), and its unambiguous language will likewise be interpreted according to its plain and commonly accepted meaning. *Seashore Performing Arts Ctr., Inc. v. Town of Old Orchard Beach*, 676 A.2d 482, 482 (Me. 1996).

This is a question of contract law. Did Grant give "prior written approval" of the Policy's subrogation provision? Grant's argument appears to be that because the subrogation provision does

5

not explicitly state it requires the insured's approval and because there was no separate approval requested for this specific provision, that part of the Policy fails as a matter of law under §§ 2729-A & 2910-A and is now unenforceable. The term "prior" here must mean that the written approval is to be given before any lien or reimbursement is sought. There is ambiguity to what "written approval" itself comprises. There is no dispute that the Policy was in writing and that its subrogation provision states MCHO can recover the value of benefits it has provided if an insurer has been reimbursed for the cost of care by a third party. There can be no dispute that Grant's wife, the policy holder, had access to the complete language of the Policy via her family's online profile with MCHO and accepted its terms in general, thereby entering into a contractual relationship with MCHO, by making premium payments. She applied for health insurance in an online marketplace, established a profile in MCHO's online portal, and continued making proper premium payments in accordance with the Policy. The fact that Grant's wife never signed a document or clicked on a link specifically asking her to approve the lien provision does not inherently mean it is any more unenforceable than any other term of the Policy.

There is, however, great dispute between the parties as to whether the totality of these circumstances equate to "prior written approval" by the Grants of that specific term under § 2729-A. The Grants argue that they lacked actual notice of the Terms and that the lien provision was so buried within MCHO's website that they could not have had the requisite reasonable notice to enable them to approve it. Without explicitly applying it here, this Court looks to the Law Court's analysis of the enforceability of contracts of adhesion entered into by consumers online in *Sarchi v. Uber Techs, Inc.* for guidance on the issue. 2022 ME 8, 268 A.3d 258. In *Sarchi*, the plaintiff registered with Uber through an app on her phone. When a dispute arose between her and Uber, the latter attempted to enforce its terms and conditions, to which Sarchi had allegedly consented

6

by the act of registering with the company through the app, to force the matter into arbitration. The Law Court held that the arbitration term was unenforceable because Uber had not provided reasonable notice of this provision to Sarchi and consequently Sarchi did not manifest assent to it. *Id.* ¶ 46.

In its analysis, the Law Court explained that there are at least four general categories of online purchase contracts. These are (i) **browsewrap**, in which the online host dictates assent is given by the use of its website and generally provides a link to its terms at the bottom of the page; (ii) **clickwrap**, in which the user must click a link, typically reading "AGREE" or its equivalent, to access the service which stipulates that using the link equates to assent to the terms; (iii) **scrollwrap**, in which the user must scroll through the terms' text to reach the "AGREE" link; and (iv) **sign-in wrap**, in which the online host informs the user that terms exist and that the user is deemed to assent to them by registering for the host's services or signing into the user's account. *Id.* ¶ 18. Clickwrap and scrollwrap are consistently enforced because the provide a realistic opportunity for the user to read the terms and provide assent, browsewrap is often unenforceable when it provides no assurance the user is put on notice of the terms, and sign-in wrap requires a fact-intensive inquiry to determine enforceability. *Id.* ¶¶ 19-22.

These categories are useful as aids to analysis, but enforceability of online contracts ultimately turns on an investigation of whether they provide the user with reasonable notice and whether the user manifest assent. *Id.* ¶ 25. Actual notice is *per se* reasonable notice but in its absence "the totality of the circumstances must be evaluated in determining whether reasonable notice has been given." *Id.* ¶ 27 (quoting *Kauders v. Uber Techs, Inc.*, 486 Mass. 557, 573 (Mass. 2021)).

Based on the facts alleged by the parties, MCHO's contract does not fit neatly into any of the *Sarchi* categories, and it is unclear whether and to what extent the holding in that case, which dealt specifically with entering into online adhesion contracts for services, is applicable to the instant context regarding the enforceability of a term in an insurance contract. Even so, *Sarchi*'s focus on "reasonable notice" is instructive. The Policy language was available to the Grants and included the lien provision prior to MCHO seeking to enforce that provision. The Grants apparently deny they had actual notice of this written provision, because such notice combined with their payments constituting acceptance would render the provision clearly enforceable. But even if the Grants had reasonable notice of these terms and conditions, which included the lien provision, it is likely that they would be deemed as having approved that provision as part of their general contractual relationship. Whether "the totality of the circumstances" indicate such notice was provided to the Grants is a disputed question of fact which this Court cannot resolve on summary judgment.

## CONCLUSION

Based on the foregoing, the entry will be: Counterclaimant Michael Grant's motion for summary judgment is DENIED.

SO ORDERED.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to M.R. Civ. P. 79(a).

Date: **7/6/2022**

_____
M. Michaela Murphy, Justice
Business & Consumer Court.

8